# EXHIBIT 2

## DISTRIBUTOR AGREEMENT

This DISTRIBUTOR AGREEMENT (this "**Agreement**"), dated as of August 1, 2021 is entered into between Caerus Corp., a Minnesota corporation, d/b/a OrthoCor Medical ("**Seller**"), and PEMF NATIONAL LLC, a MICHIGAN COMPANY ("**Distributor**," and together with Seller, the "**Parties**," and each, a "**Party**").

## RECITALS

A. Seller is in the business of developing, manufacturing, marketing and selling the medical devices and related items set forth on Exhibit A hereto (collectively, the "**Products**"), and Distributor is experienced in distributing, marketing, selling and supporting sales of the Products.

B. Seller desires to sell the Products to Distributor and appoint Distributor as a non-exclusive distributor under the terms and conditions of this Agreement, and Distributor desires to purchase the Products from Seller and resell the Products to the accounts set forth on Exhibit B hereto, as it may be amended from time to time by mutual written agreement of the Parties (collectively, the "**Accounts**"), subject to the terms and conditions of this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1. **Appointment.** Seller hereby appoints Distributor, and Distributor hereby accepts the appointment, to act as a non-exclusive distributor of the Products to the Accounts during the Term in accordance with the terms and conditions of this Agreement. Distributor shall not sell or offer to sell the Products to any persons other than the Accounts and shall not obtain any Products for resale or use from any person other than Seller. Seller may, in its sole discretion, sell the Products to the Accounts and to any other persons. By accepting this appointment, Distributor agrees to conform to all quality standards established from

time to time by Seller for its distributors, which are subject to change by Seller on 30 days' prior notice to Distributor.

1.

2. **Distributor Obligations.** During the Term, Distributor shall:

    2.1.    market, advertise, promote and sell the Products to the Accounts in a manner that reflects favorably at all times on the Products and the good name, goodwill and reputation of Seller and consistent with good business practice, in each case using its best efforts to maximize the sales volume of the Products;

    2.2.    maintain adequate office, storage and warehouse facilities and all other facilities as required for Distributor to perform its duties under this Agreement, including but not limited to storing the Products in a separate, climate-controlled area;

    2.3.    purchase and maintain at all times a representative quantity of each Product sufficient for and consistent with the Distributor's reasonably anticipated sales needs;

    2.4.    have sufficient knowledge of the industry and products competitive with each Product (including specifications, features and benefits) so as to be able to explain in detail to its customers (a) the differences between a Product and competing products and (b) information on standard protocols and features of each Product;

    2.5.    train all customers with respect to the use of the Products in accordance with Seller's then-current training program requirements;

    2.6.    observe all directions and instructions given to it by Seller in relation to the marketing, advertisement and promotion of the Products, including Seller's sales, marketing and merchandising policies as they currently exist or as they may hereafter be changed by Seller;

    2.7.    promptly comply with any recalls of the Products issued by Seller or any applicable regulatory authority or with any notices of corrective actions with respect to the Products, including locating and retrieving the Products, if necessary;

    2.8.    not use any promotional and marketing materials, whether prepared by Distributor or others, without the prior written consent of Seller;

    2.9.    not make any representations, warranties or guarantees to customers with respect to the specifications, indications, capabilities or features of any Product that are

inconsistent with any promotional or marketing materials provided to Distributor by Seller;

2.10. establish and maintain a sales and marketing organization sufficient to develop to the satisfaction of Seller the market potential for the sale of the Products and independent sales representatives, facilities and a distribution organization sufficient to make the Products available for shipment by Distributor to its customers immediately on receipt of an order;

2.11. develop and execute a sales and marketing plan sufficient to fulfill its obligations under this Agreement;

2.12. not make any materially misleading or untrue statements concerning Seller or the Products, including any product disparagement or "bait-and-switch" practices;

2.13. promptly notify Seller of any complaint or adverse claim about any Product or its use of which Distributor becomes aware;

2.14. maintain a detailed tracking system that enables Distributor to track Products by serial number(s), such information which shall be provided to Seller within 24 hours of Seller's request;

2.15. to the extent permitted by applicable law, provide Seller with contact information, including names, addresses, phone numbers and email addresses, of all persons involved in selling the Products;

2.16. during the first week of each calendar month during the Term, provide Seller a forecast and sales and marketing report with respect to the Products, in the form reasonably requested by Seller;

2.17. meet quarterly (or on such basis as is reasonably requested by Seller) with Seller's management to review Distributor's performance, set objectives and develop strategies to achieve sales goals;

2.18. not appoint any sub-dealers or sub-distributors and shall not sell any Products to third parties for resale;

2.19. not promote or sell, directly or indirectly, any products offered for sale by another person which compete with the Products (such competing products are as set forth on <u>Exhibit C</u> hereto) and disclose to Seller any new products Distributor intends to

distribute during the Term for Seller's determination of whether such products may be competing.

3. **Seller Obligations.** During the Term, Seller shall:

   3.1. provide any information and support that may be reasonably requested by Distributor regarding the marketing, advertising, promotion and sale of Products; *provided, however,* that Seller may charge up to $200 for each demo unit, sales kit and/or POD it provides to Distributor for use as a sales tool;

   3.2. allow Distributor to participate, at its own expense, in any marketing, advertising, promotion and sales programs or events that Seller may make generally available to its authorized distributors of Products, provided that Seller may alter or eliminate any program at any time;

   3.3. approve or reject, in its sole discretion, any promotional information or material submitted by Distributor for Seller's approval within 14 business days of receipt; and

   3.4. notify Distributor of any Product correction requiring an advisory notice to customers and reimburse Distributor for all reasonable and documented out-of-pocket expenses of Distributor in assisting Seller with such corrective action, including locating and retrieving Products, if necessary.

4. **Purchase and Sale of Products.** Seller shall make available and sell the Products to Distributor at the prices and on the terms and conditions set forth in this Section 4.

   4.1. **Price.** Subject to Section 4.3, the prices for Products sold under this Agreement shall be as set forth on Exhibit A. Subject to Section 6, (a) all prices are exclusive of all sales, use and excise taxes and any other similar taxes, duties and charges of any kind imposed on any amounts payable by Distributor under this Agreement; (b) Distributor is responsible for all charges, costs and taxes, provided that Distributor is not responsible for any taxes imposed on, or regarding, Seller's income; and (c) Distributor shall pay interest on all late payments, calculated daily and compounded quarterly, at the rate of one and one-half percent per annum. Distributor shall perform its obligations under this Agreement without setoff, deduction, recoupment or withholding of any kind for amounts owed or payable by Seller, whether relating to Seller's or Seller's affiliates' breach, bankruptcy or otherwise and whether under this Agreement, any purchase order or any other agreement between (i) Distributor or any of its affiliates and (ii) Seller or any of its affiliates, or otherwise.

4

    4.2.    **Payment Terms.** Payment is due net sixty (60) days from date of delivery. Invoices not paid within thirty (30) days of the invoice due date shall bear interest at the rate of 1.5% per month (18% APR) (or, if less, the maximum amount permitted by law) until the date of payment. Distributor will pay all costs and expenses (including reasonable attorneys' fees) Seller incurs in the collection of overdue amounts. In the event any invoice is not paid when due, in addition to payment of finance charges and collection costs, Seller may, at its option, require prepayment for any products or services, eliminate all discounts, or suspend further orders and/or deliveries until the account is paid in full. The remedies set forth in this Section 4.2 are in addition to and do not exclude or limit any other rights or remedies provided by law. Distributor shall make all payments in U.S. dollars by check or wire transfer of immediately available funds, in accordance with the payment instructions set forth on Seller's invoice.

    4.3.    **Availability of Products.** Seller may, in its sole discretion, add or make changes to Products, including changing the price of a Product(s), reduce or allocate its inventory of Products or remove Products from Exhibit A upon 90 days' prior written notice to Distributor, in each case, without obligation to modify or change any Products previously delivered or to supply new Products meeting earlier specifications. Notwithstanding the foregoing, Seller makes no guarantees to Distributor regarding the inventory of Product(s) set forth on Exhibit A, and the unavailability of any Product(s) at a given time shall not be considered a breach of this Agreement by Seller, including for purposes of Section 14.

5.**Orders.** Distributor shall issue all purchase orders to Seller using Seller's written form via facsimile, e-mail or U.S. mail. By placing an order, Distributor makes an offer to purchase Products under the following commercial terms to be listed in the purchase order and the terms and conditions of this Agreement, and on no other terms: (a) the listed Products to be purchased; (b) the quantities ordered; and (c) the requested delivery date. Any variations made to the terms and conditions of this Agreement by Distributor in any purchase order are void and have no effect. Seller may, in its sole discretion, accept or reject any order. Seller may accept any order by confirming the order in writing or by delivering the Products, whichever occurs first. If Seller does not accept the order under the terms of this Section 5 within 14 days of Seller's receipt of the order, the order will lapse. No order is binding on Seller unless accepted by Seller as provided in this Agreement.

6.**Shipment; Title; Inspection.**

    6.1.    **Shipment and Delivery.** Unless expressly agreed to by the Parties in writing, Seller shall: (a) select the method of shipment of and the carrier for the Products, and

Seller may, in its sole discretion, without liability or penalty, make partial shipments of Products, each of which constitutes a separate sale, and Distributor shall pay for the units shipped; and (b) deliver the Products to Distributor using Seller's standard methods for packaging and shipping, with all prices FOB Seller's dock in Arden Hills, Minnesota and any time quoted for delivery being an estimate only.

6.2. **Title and Risk of Loss.** Title and risk of loss passes to Distributor upon delivery of the Products to Seller's dock in Arden Hills, Minnesota. As collateral security for the payment of the purchase price of the Products, Distributor hereby grants to Seller a lien on and security interest in and to all of the right, title and interest of Distributor in, to and under the Products, wherever located, and whether now existing or hereafter arising or acquired from time to time, and in all accessions thereto and replacements or modifications thereof, as well as all proceeds (including insurance proceeds) of the foregoing. The security interest granted under this provision constitutes a purchase money security interest under the Minnesota Uniform Commercial Code.

6.3. **Inspection and Acceptance of Products.** Distributor shall inspect Products received under this Agreement. On the 14th day after delivery of the Products, Distributor shall be deemed to have accepted the Products unless it earlier notifies Seller in writing and furnishes written evidence or other documentation as reasonably required by Seller that the Products: (a) are damaged, defective or otherwise do not conform to the specifications listed in the applicable purchase order; or (b) were delivered to Distributor as a result of Seller's error. If Distributor notifies Seller pursuant to this Section 6.3, then Seller shall determine, in its sole discretion, whether to repair or replace the Products or refund the purchase price for the Products. Distributor shall ship, at Seller's expense, all Products to be returned, repaired or replaced under this Section 6.3 to Seller's facility located at 1251 Red Fox Road, Arden Hills, Minnesota 55112. If Seller exercises its option to replace the Products, Seller shall, after receiving Distributor's shipment of the Products under this provision, ship to Distributor, at Seller's expense, the replacement Products to Distributor's facility. Distributor acknowledges and agrees that the remedies set out in this Section 6.3 are exclusive of all other remedies, subject to Distributor's rights under Section 12 regarding any Products for which Distributor has accepted delivery under this Section 6.3. Except as provided under this Section 6.3 and Section 12, all sales of Products to Distributor under this Agreement are made on a one-way basis, and Distributor has no other right to return Products purchased under this Agreement.

7. **Seller's Trademark License Grant.** Distributor acknowledges and agrees that any and all of Seller's intellectual property rights are the sole and exclusive property of Seller or its licensors, and Distributor shall not acquire any ownership interest in any of Seller's intellectual property rights under this Agreement. Notwithstanding the foregoing, subject

6

to the terms and conditions of this Agreement, Seller hereby grants Distributor a non-exclusive, non-transferable and non-sublicensable license during the Term, solely on or in connection with the marketing, promotion, advertising and sale of the Products in accordance with the terms and conditions of this Agreement, to use those trademarks, trade names and/or service marks of Seller set forth on Exhibit D hereto, whether registered or unregistered. Upon the expiration or earlier termination of this Agreement or upon Seller's request, Distributor shall promptly discontinue the display or use of any trademark, trade name and/or service mark or change the manner in which it is displayed or used with regard to the Products. Upon the expiration or earlier termination of this Agreement, Distributor's rights under this Section 7 shall cease immediately. Other than the express licenses granted by this Section 7, Seller grants no right or license to Distributor, by implication, estoppels or otherwise, to the Products or any intellectual property rights of Seller or its affiliates.

8. **Resale Prices.** Distributor shall unilaterally establish its own resale prices and terms regarding the Products; *provided, however,* that Distributor shall establish resale prices that are no lower than the Minimally Advertised Prices ("**MAPs**") set forth on Exhibit A hereto.[1]

9. **Audit and Inspection Rights.** During the Term, upon request, and mutual agreement; during regular business hours, Seller or its representatives may, at their own expense, reasonably inspect Distributor's facility in __Lake Orion, Mi_____ and audit Distributor's books, records and other documents as necessary to verify compliance with the terms and conditions of this Agreement.

10. **Term; Termination.**

    10.1.   **Term.** The term of this Agreement commences on the date set forth in the preamble of this Agreement and terminates on the three-year anniversary thereof and may be extended for such additional period(s) as may be agreed upon by the Parties in writing, or unless and until earlier terminated as provided under this Agreement or applicable law (the "**Term**").

    10.2.   **Termination Rights.**

    (a)   Notwithstanding anything to the contrary in this Agreement, either Party may terminate this Agreement for any or no reason, at any time upon at least 90 days' prior written notice to the other Party.

7

(b)     In addition to any remedies that may be provided in this Agreement, Seller may immediately terminate this Agreement (including all related purchase orders pursuant to Section 10.3) upon written notice to Distributor if Distributor: (a) fails to pay any amount when due under this Agreement; (b) is in breach of this Agreement and either the breach cannot be cured or, if the breach can be cured, it is not cured within 30 days following Distributor's receipt of notice of such breach; or (c) if Distributor: (i) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (ii) files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (iii) seeks reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to it or its debts; (iv) makes or seeks to make a general assignment for the benefit of its creditors; or (v) applies for or has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

10.3.   **Effect of Expiration or Termination.** Upon the expiration or earlier termination of this Agreement: (a) all related purchase orders are automatically terminated; (b) Distributor shall cease to represent itself as Seller's authorized distributor regarding the Products and shall otherwise desist from all conduct or representations that might lead the public to believe that Distributor is authorized by Seller to sell the Products; and (c) Distributor shall, within 10 business days following termination, return or destroy (pursuant to Seller's instructions) all: (i) documents and tangible materials (and any copies) containing, reflecting, incorporating or based on Confidential Information; (ii) products that Seller provided to Distributor that are not intended for resale; and (iii) sales records, training records, customer lists and reports pertaining to the Products.

10.4.   **Option to Repurchase.** Within 10 days after the effective date of expiration or earlier termination, Distributor shall submit to Seller a written schedule reflecting all Products then owned by Distributor or in the Distributor's possession. Upon written notice within 30 days following its receipt of such schedule from Distributor, Seller shall have the right, but not the obligation, to buy back all or a portion of such Products, free of all liens, claims or encumbrances, at a price equal to the Distributor's cost therefor, pursuant to the following procedures: Distributor shall promptly deliver, at Seller's reasonable expense, the repurchased Products in their original packaging (unopened and undamaged) to Seller's designated carrier for delivery to Seller.

11. **Confidential Information.** All non-public, confidential or proprietary information of Seller, including, but not limited to, specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, financial information of Seller, customer lists, pricing, commission rates, discounts or rebates, or the terms of this Agreement, disclosed by Seller to Distributor, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and is marked, designated or otherwise identified as "confidential" in connection with this Agreement is confidential, solely for the use of performing this Agreement and may not be disclosed or copied unless authorized by Seller in writing. Upon Seller's request, Distributor shall promptly return all documents and other materials received from Seller. Seller shall be entitled to injunctive relief for any violation of this Section. Notwithstanding the foregoing, this Section shall not apply to information that is: (a) in the public domain; (b) known to Distributor at the time of disclosure; or (c) rightfully obtained by Distributor on a non-confidential basis from a third party.

12. **Limited Product Warranty; Disclaimer.** Seller warrants that the Products are free from defects in material and workmanship under normal use and service with proper maintenance for 12 months. The term for such warranties shall begin upon a customer's receipt of the Product. Either Distributor or such customer shall promptly notify Seller of any known warranty claims and shall cooperate in the investigation of such claims. If any Product is proven to not conform with this warranty during the applicable warranty period, Seller shall, at its exclusive option, either repair or replace the Product or refund the purchase price paid by Distributor for each non-conforming Product. Notwithstanding the foregoing, Seller shall have no obligation under the warranty set forth above if either Distributor or the customer: (a) fails to notify Seller in writing during the warranty period of a non-conformity; (b) fails to obtain a Return Material Authorization number from Seller prior to returning any Product; or (c) uses, misuses or neglects the Product in a manner inconsistent with the Product's specifications or use or maintenance directions, modifies the Product or improperly installs, handles or maintains the Product. Except as explicitly authorized in this Agreement or in a separate written agreement with Seller, Distributor shall not service, repair, modify, alter, replace, reverse engineer or otherwise change any Products it sells. Distributor shall not provide its own warranty regarding any Product.

  2. EXCEPT FOR THE WARRANTIES SET OUT UNDER THIS SECTION 12, NEITHER SELLER NOR ANY PERSON ON SELLER'S BEHALF HAS MADE OR MAKES FOR DISTRIBUTOR'S BENEFIT ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WHATSOEVER, INCLUDING ANY WARRANTIES OF: (i) MERCHANTABILITY; (ii) FITNESS FOR A PARTICULAR PURPOSE; (iii) TITLE; OR (iv) NON-INFRINGEMENT; WHETHER ARISING BY LAW,

COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED. DISTRIBUTOR ACKNOWLEDGES THAT IT HAS NOT RELIED ON ANY REPRESENTATION OR WARRANTY MADE BY SELLER, OR ANY OTHER PERSON ON SELLER'S BEHALF.

13. **Compliance With Laws.** Distributor shall at all times comply with all federal, state and local laws, ordinances, regulations and orders that are applicable to the operation of its business and this Agreement and its performance hereunder, including but not limited to the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**") and all implementing regulations issued pursuant thereto, as may be amended from time to time. To the extent applicable, Distributor shall comply with all requirements of the HIPAA Standards for Privacy of Individually Identifiable Health Information, Security and the Transactions and Code Sets Standards under HIPAA. Distributor shall protect the confidentiality, privacy and security of all medical records or other health-related information that Distributor or any employee or agent of Distributor may create or receive for or from Seller pursuant to this Agreement. Distributor represents and warrants that neither Distributor nor any of its employees has been or currently is the subject of any inquiry or investigation by the federal government or any state or local government with respect to health care fraud or abuse of law. Without limiting the generality of the foregoing, Distributor shall at all times, at its own expense, obtain and maintain all certifications, credentials, authorizations, licenses and permits necessary to conduct its business relating to the exercise of its rights and the performance of its obligations under this Agreement.

14. **Indemnification.** Subject to the terms and conditions of this Agreement, both Parties shall indemnify, hold harmless and defend the other Party and its officers, directors, partners, members, shareholders, employees, agents, affiliates, successors and permitted assigns (collectively, the "**Indemnified Parties**") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs or expenses of whatever kind, including attorneys' fees, the costs of enforcing any right to indemnification under this Agreement and the costs of pursuing any insurance providers, relating to any claim of a third party or other Party arising out of or occurring in connection with: (a) the other Party's breach or non-fulfillment of any representation, warranty or covenant under this Agreement by the other Party or its personnel; (b) any act or omission of the other Party or its personnel (including any recklessness or willful misconduct) in connection with the performance of its obligations under this Agreement; (c) any bodily injury, death of any person or damage to real or tangible personal property caused by the acts or omissions of the other Party; (d) Distributor's advertising or representations that warrant performance of Products beyond that provided by Seller's

written warranty or based upon Distributor's business or trade practices; (e) any failure by the other Party or its personnel to comply with any applicable laws; or (f) allegations that the other Party breached its agreement with a third party as a result of or in connection with entering into, performing under or terminating this Agreement.

15. **Limitation of Liability.** EXCEPT FOR OBLIGATIONS TO MAKE PAYMENT UNDER THIS AGREEMENT, LIABILITY FOR INDEMNIFICATION, LIABILITY FOR BREACH OF CONFIDENTIALITY OR LIABILITY FOR INFRINGEMENT OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY RIGHTS, IN NO EVENT: (A) IS SELLER, DISTRIBUTOR, OR ANY REPRESENTATIVE FOR EITHER LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS AGREEMENT, REGARDLESS OF: (I) WHETHER THE DAMAGES WERE FORESEEABLE; (II) WHETHER OR NOT EITHER PARTY WAS ADVISED OF THE POSSIBILITY OF THE DAMAGES; AND (III) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT, OR OTHERWISE) ON WHICH THE CLAIM IS BASED; OR (B) SHALL EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EXCEED THE TOTAL OF THE AMOUNTS PAID AND AMOUNTS ACCRUED BUT NOT YET PAID TO EITHER PARTY UNDER THIS AGREEMENT IN THE ONE YEAR PERIOD PRECEDING THE EVENT GIVING RISE TO THE CLAIM. THE FOREGOING LIMITATIONS APPLY EVEN IF EITHER PARTY'S REMEDIES UNDER THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE.

16. **Insurance.** Throughout the Term, Distributor shall, at its own expense, maintain and carry insurance in full force and effect that includes, but is not limited to, commercial general liability (including product liability) with limits no less than $1,000,000 for each occurrence and $2,000,000 in the aggregate with financially sound and reputable insurers. Upon Seller's request, Distributor shall provide Seller with a certificate of insurance and policy endorsements for all insurance coverage required by this Section 16 and shall not do anything to invalidate such insurance. The certificate of insurance shall name Seller as an additional insured. Distributor shall provide Seller with 15 days' advance written notice in the event of a cancellation or material change in Distributor's insurance policy. Except where prohibited by law, Distributor shall require its insurer to waive all rights of subrogation against Seller's insurers, Seller and the other Indemnified Parties.

17. **Entire Agreement.** This Agreement, including and together with any related exhibits, schedules, attachments and appendices, constitutes the sole and entire agreement of the

Parties with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, regarding such subject matter. The terms of this Agreement prevail over any terms or conditions contained in any other documentation related to the subject matter of this Agreement and expressly exclude any of Distributor's general terms and conditions contained in any purchase order or other document issued by Distributor (excluding the information set out in Section 5).

18. **Survival.** Subject to the limitations and other provisions of this Agreement: (a) the representations and warranties of the Parties contained herein shall survive the expiration or earlier termination of this Agreement; and (b) any other provision that, in order to give proper effect to its intent, should survive such expiration or termination, shall survive the expiration or earlier termination of this Agreement.

19. **Notices.** All notices, requests, consents, claims, demands, waivers and other communications under this Agreement must be in writing and addressed to the other Party at its address set forth below (or to such other address that the receiving Party may designate from time to time in accordance with this Section). Unless otherwise agreed herein, all notices must be delivered by personal delivery, nationally recognized overnight courier, or certified or registered mail (in each case, return receipt requested and postage prepaid). Except as otherwise provided in this Agreement, a notice is effective only (a) upon receipt by the receiving Party and (b) if the Party giving the notice has complied with the requirements of this Section.

3.

Notice to Seller:           Caerus Corp., d/b/a OrthoCor Medical
                            Attention: John Dinusson
                            1251 Red Fox Road
                            Arden Hills, MN 55112


Notice to Distributor:
                            _____
                            Attention: _____
                            _____
                            _____



20. **Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable

such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal or unenforceable, the court may modify this Agreement to give effect to the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

21. **Amendments**. No amendment to this Agreement is effective unless it is in writing and signed by an authorized representative of each Party.

22. **Waiver**. No waiver by any Party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

23. **Cumulative Remedies**. All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties or otherwise. Notwithstanding the previous sentence, the Parties intend that Distributor's rights under Section 6.3 and Section 12 are Distributor's exclusive remedies for the events specified therein.

24. **Assignment**. Distributor shall not assign, transfer, delegate or subcontract any of its rights or obligations under this Agreement without the prior written consent of Seller. Any purported assignment or delegation in violation of this Section shall be null and void. No assignment or delegation shall relieve Distributor of any of its obligations hereunder. Seller may at any time assign, transfer or subcontract any or all of its rights or obligations under this Agreement without Distributor's prior written consent.

25. **Successors and Assigns**. This Agreement is binding on and inures to the benefit of the Parties to this Agreement and their respective permitted successors and permitted assigns.

26. **No Third-Party Beneficiaries**. This Agreement benefits solely the Parties to this Agreement and their respective permitted successors and assigns and nothing in this Agreement, express or implied, confers on any other person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement;

*provided, however,* that the Parties hereby designate the Indemnified Parties as third-party beneficiaries of Section 14 with the right to enforce this provision.

27. **Choice of Law.** This Agreement, including all exhibits, schedules, attachments and appendices attached to this Agreement and thereto, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Minnesota, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Minnesota.

28. **Choice of Forum; Waiver of Jury Trial.** Each Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever against the other Party in any way arising from or relating to this Agreement, including all exhibits, schedules, attachments, and appendices attached to this Agreement, and all contemplated transactions, in any forum other than the District Court of Minnesota or the courts of the State of Minnesota sitting in Ramsey County, Minnesota, and any appellate court from any thereof. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation or proceeding only in the District Court of Minnesota or the courts of the State of Minnesota sitting in Ramsey County, Minnesota. Each Party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, INCLUDING EXHIBITS, SCHEDULES, ATTACHMENTS AND APPENDICES ATTACHED TO THIS AGREEMENT, IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, ATTACHMENTS OR APPENDICES ATTACHED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

29. **Counterparts.** This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. Notwithstanding anything to the contrary in Section 19, a signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

30. **Force Majeure.** No Party shall be liable or responsible to the other Party, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement (except for any obligations to make payments to the other Party under this Agreement), when and to the extent the failure or delay is caused by or results from acts beyond the impacted Party's (the "**Impacted Party**") reasonable control (which events may include natural disasters, embargoes, explosions, riots, wars or acts of invasion or terrorism, requirements of law or national or regional emergency) (each, a "**Force Majeure Event**"). An Impacted Party shall give the other Party prompt written notice of any event or circumstance that is reasonably likely to result in a Force Majeure Event and the anticipated duration of such Force Majeure Event. An Impacted Party shall use all commercially reasonable efforts to end the Force Majeure Event, ensure that the effects of any Force Majeure Event are minimized and resume full performance under this Agreement.

31. **Status as Independent Contractors.** The Parties are independent contractors, and nothing in this Agreement shall be deemed or construed as creating a joint venture, partnership, agency relationship, franchise or business opportunity between them. Neither Party, by virtue of this Agreement, will have any right, power or authority to act or create an obligation, express or implied, on behalf of the other Party. Each Party assumes responsibility for the actions of their personnel under this Agreement and will be solely responsible for their supervision, daily direction and control, wage rates, withholding income taxes, disability benefits or the manner and means through which the work under this Agreement will be accomplished. Except as provided otherwise in this Agreement, Distributor has the sole discretion to determine Distributor's methods of operation, Distributor's accounting practices, the types and amounts of insurance Distributor carries, Distributor's personnel practices, Distributor's advertising and promotion, its customers and Distributor's service areas and methods. The relationship created hereby between the Parties is solely that of seller and distributor.

4.  *[Signature Page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

**CAERUS CORP., d/b/a ORTHOCOR MEDICAL**

By: *John Dinusson* (DocuSigned by John Dinusson, 05D460532F06433)

Its: President & Founder

**DISTRIBUTOR:**

PEMF NATIONAL, LLC

By: Doug Jones

Its: MEMBER